THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

JEFFERY MICHAEL MOORE                                                    PLAINTIFF

v.                                   Case No.  4:20-cv-00258-KGB

JAMES GIBSON, *individually and in his*                                DEFENDANTS
*official capacity as a police officer for the*
*city of Vilonia Arkansas*

<u>OPINION AND ORDER</u>

Before the Court is a motion for summary judgment filed by defendant James Gibson ("Officer Gibson") (Dkt. No. 18).  Plaintiff Jeffery Michael Moore brings this action against Officer Gibson in his individual and official capacity as a police officer for the city of Vilonia, Arkansas ("City") (Dkt. No. 1).  Mr. Moore alleges the following:  (1) that Officer Gibson violated Mr. Moore's Fourth "Amendment rights to be free from search and seizure under the United States Constitution, as well as the Arkansas Constitution" and arrested Mr. Moore without probable cause (Dkt. Nos. 1; ¶¶ 3, 20–22; 18, ¶ 2), (2) that Officer Gibson took these actions because Mr. Moore "invoked his First Amendment rights to Freedom of Speech under the Federal Constitution, as well as his clearly established right to remonstrate under the Arkansas State Constitution" (Dkt. Nos. 1; ¶ 29; 18, ¶ 2), (3) that Officer Gibson "caused criminal charges, namely disorderly conduct or criminal trespass, to be filed against [Mr. Moore], without probable cause," thus engaging in malicious prosecution and abuse of process (Dkt. Nos. 1; ¶¶ 3, 26, 28; 18, ¶ 2), (4) that the City "failed to train its officers, including [Officer Gibson], in the appropriate probable cause necessary to arrest an American citizen and has ratified [Officer Gibson's] conduct" (Dkt. Nos. 1; ¶ 21; 18, ¶ 2), and (5) that the "City of Vilonia has failed to train [Officer Gibson] in the appropriate response

to protected speech under the Arkansas State Constitution and the [First] Amendment to the Federal Constitution" (Dkt. Nos. 1; ¶ 30; 18, ¶ 2).

Officer Gibson filed his motion for summary judgment maintaining that no dispute of material fact exists and that he is entitled to judgment as a matter of law (Dkt. No. 18, ¶ 6). Fed. R. Civ. P. 56. Mr. Moore disagrees and argues that Officer Gibson's account of events directly contradicts a recording of the events in question and Mr. Moore's recollections (Dkt. No. 27, ¶ 2). Based on the record evidence, viewed in the light most favorable to the Mr. Moore, the Court grants Officer Gibson's motion for summary judgment and enters judgment as a matter of law in favor of defendants (Dkt. No. 18).

## I.   Factual Background

### A.   The Soccer Game

Unless otherwise noted, the following facts are taken from Officer Gibson's statement of undisputed material facts, Mr. Moore's response to Officer Gibson's statement of undisputed material facts, and Officer Gibson's reply to Mr. Moore's response to Officer Gibson's statement of undisputed material facts (Dkt. Nos. 19; 28; 31).

On Saturday, March 24, 2018, Mr. Moore was attending and coaching his daughter's recreational soccer team out of Conway in a game against a recreational soccer team out of Vilonia at the Vilonia soccer fields (Dkt. No. 19, ¶ 1). Another Conway parent, Eric, was helping Mr. Moore coach (*Id.*, ¶ 2).

Approximately five minutes into the game, the ball went out of bounds in front of the Conway team's parents (*Id.*, ¶ 3). There were two people refereeing the game: the head referee, Brandon Torling ("Ref. Torling"), and the line judge, which is usually a young kid, a teenager (*Id.*, ¶ 4). The line judge called the ball for the Conway team (*Id.*, ¶ 5). Mr. Moore and Ref. Torling

were on the other side of the field from where the ball went out of bounds (*Id.*, ¶ 6).  Ref. Torling began making his way across the field in the direction of where the ball went out of bounds while calling the ball for the Vilonia team (*Id.*, ¶ 7).[1]  There was "mass confusion" because the line referee was saying that it was Conway's ball; Ref. Torling was saying it was Vilonia's ball; some parents were yelling it was Conway's ball; some parents were yelling it was Vilonia's ball; and the kids were just standing there confused (*Id.*, ¶ 8).

According to Mr. Moore, Ref. Torling then went to where the Conway parents were screaming and yelled at the parents to, "shut up, [because Ref. Torling was] the one running this game" (*Id.*, ¶ 9).  Ref. Torling then turned around and started back across the field to where Mr. Moore was located (*Id.*, ¶ 10).  Because there were kids in the area in which Mr. Moore was located, he began to walk out into the field to meet Ref. Torling, so that when they spoke, no one would hear their conversation, and Mr. Moore would not embarrass Ref. Torling in front of the kids (*Id.*, ¶ 11).  According to Mr. Moore, Ref. Torling came to Mr. Moore and said, "You're going to go over there and tell your parents to shut up"; Mr. Moore laughed and replied, "No. I know better.  Look, let me tell you what's going to happen here, I know you have a kid on the other team.  You are going to go back out there, and you are going to call a non-biased game today because if you do not do that, I will report you at the end of the day.  So, let's play ball and have fun" (*Id.*, ¶ 12).  Mr. Moore then turned around and started walking away (*Id.*).[2]  According to Mr. Moore, Ref. Torling then yelled at Mr. Moore again, saying, "Coach, are you not going to tell your

_____

[1]  Mr. Moore points out that the line judge called the ball for the Conway team.  He notes that Ref. Torling reversed the line judge even though Ref. Torling had a poor angle to the ball (Dkt. Nos. 28, ¶ 7; 31, at 1).  Ref Torling's angle to the ball is not outcome determinative.

[2]  Mr. Moore further points out that he "did not argue [Ref. Torling's] call, was calm, did not cuss, did not scream or yell, [and] did not wave his hands." (Dkt. 28, ¶ 12).

parents to shut up?", to which Mr. Moore replied, "No, sir. They've done nothing wrong." (*Id.*, ¶ 13).

Ref. Torling then told Mr. Moore that he was "out of the game" (*Id.*, ¶ 14).[3]  Mr. Moore then walked back to the bench to pick up his cooler and tablet to leave, realized that the kids would need the cooler and that the assistant coach, Eric, would need the tablet, so he flipped open the cooler, grabbed a Gatorade, and started walking "in a direct line" to his car (*Id.*, ¶ 15).[4]  The "direct line" to Mr. Moore's car was across the middle of the field and went directly through the middle of where the Conway parents were congregated (*Id.*, ¶ 16).  When Mr. Moore got to the Conway parents, they stopped him, and conversation ensued regarding why Mr. Moore was leaving the game (*Id.*, ¶ 17).  Ref. Torling then yelled to Mr. Moore, "Coach, you have to leave the entire complex." (*Id.*, ¶ 18).  At this point, Mr. Moore was still answering questions from the Conway parents, explaining that he had been kicked out of the game and had to leave (*Id.*, ¶ 19).  Ref. Torling then yelled at Mr. Moore, again, that he had to leave the complex (*Id.*, ¶ 20).

Mr. Moore turned to start walking to his car, and as his back was to Ref. Torling, Ref. Torling yelled at him a third time that he had to leave (*Id.*, ¶ 21).  As Mr. Moore walked away, he made a gesture at Ref. Torling, not even looking at him (*Id.*, ¶ 22).  Mr. Moore claims that this gesture was a "thumbs up" (Dkt. No. 28, ¶ 22).  As Mr. Moore was walking out onto the road, he heard the whistle blow, and he turned his head back toward the field (Dkt. No. 19, ¶ 23).  Mr. Moore was told that Ref. Torling called the game because the assistant coach, Eric, told the

---

[3]  Mr. Moore claims that he was ejected from the game for "no just cause" (Dkt. No. 28, ¶ 14).

[4]  Mr. Moore adds that he remained calm throughout this interaction and "did not wave his hands, scream, or cuss" (*Id.*, ¶ 15).

Conway players, "Come on kids, I guess we've got to go play through this biased referee calling" (*Id.*, ¶ 24).

### B.     Moore's Interaction With Gibson

On March 24, 2018, Officer Gibson, a patrol officer with the City of Vilonia Police Department ("VPD"), was flagged down by James Lathe Anderson, a Vilonia parent, who was at a soccer game at the Vilonia soccer complex; Mr. Anderson told Officer Gibson that there was an individual who had been causing a disturbance, used obscene language, and was refusing to leave city property after being instructed to do so by parks and recreation staff (*Id.*, ¶ 25).[5]  Mr. Moore does not dispute the actions Mr. Anderson took (Dkt. No. 28, ¶ 25).  However, Mr. Moore, maintains that, throughout his interactions with Ref. Torling, he did not argue, "was calm, did not cuss, did not scream or yell, [and] did not wave his hands" (*Id.*, ¶ 12, 14-15, 22).  Officer Gibson's video began as he was speaking to Mr. Anderson; Mr. Anderson pointed Mr. Moore out as the individual causing the disturbance (Dkt. No. 19, ¶ 26).

The parties dispute the exact nature of what occurred next (Dkt. Nos 19, ¶ 27; 28, ¶ 27). Officer Gibson maintains that he believes he saw Mr. Moore flip off people at the soccer game while "walking in the area of the parents, children, and young soccer players" (Dkt. No. 19, ¶ 27). Mr. Moore maintains that he gave a thumbs up and was past the parents and children when making that gesture (Dkt. No. 28, ¶ 27).  Officer Gibson next contends that it appeared as though Mr.

---

[5]   Mr. Moore maintains that "any probable cause Officer Gibson had [based on his conversation with Mr. Anderson] would be on the dashcam in [Officer Gibson's] vehicle" (Dkt. No. 28, ¶ 25).  Mr. Moore argues that this conversation between Mr. Anderson and Mr. Moore could not serve as the basis for probable cause (*Id.*).  Officer Gibson argues in his reply to Mr. Moore's response to Officer Gibson's statement of undisputed facts: Mr. Moore admits all facts stated in paragraph 25 of Officer Gibson's statement of undisputed facts (Dkt. No. 31, at 1). However, Officer Gibson has pointed out in his response that he remained calm throughout his interactions with Ref. Torling, did not cuss, scream, yell, or wave his hands (Dkt. No. 28, ¶ 12, 14-15, 22).

Moore began to leave the soccer field (Dkt. No. 19, ¶ 28).  Officer Gibson states that Mr. Moore then stopped, made the above-discussed gesture, and then, upon seeing Officer Gibson's police car approach, began finally to leave the soccer complex (*Id.*).  Mr. Moore contends that the dashcam video contradicts Officer Gibson's contentions (Dkt. No. 28, ¶ 28). Specifically, Mr. Moore maintains that the dashcam video shows Officer Gibson leave Mr. Anderson and begin driving towards Mr. Moore at which point Mr. Moore stopped for approximately four seconds (*Id.*).  Mr. Moore maintains that the video then shows him continue to walk toward his car, without making the thumps up gesture (*Id.*).  It was Officer Gibson's understanding that Mr. Moore had been told to leave by the official and the soccer director (Dkt. No. 19, ¶ 29).  After speaking with Mr. Anderson, Officer Gibson began to approach Mr. Moore (Dkt. No. 19-2(a); 19-2(b)).

Officer Gibson maintains that he believed Mr. Moore had committed criminal trespass for not having left the soccer complex upon Officer Gibson's approach  (Dkt. No. 19, ¶ 31).  Mr. Moore disputes this contention, maintaining that the dashcam video indicates he was leaving when Officer Gibson approached (Dkt. No. 28, ¶ 31).  Officer Gibson explains in his reply that Mr. Moore does not deny the substance of what occurred, noting that Mr. Moore admits to not having left as soon as he was told and to having stopped in the process of leaving multiple times (Dkt. No. 31, at 3).  Officer Gibson believed that he had probable cause because he observed Mr. Moore commit the offense of disorderly conduct when he was asked to leave, and then as he was leaving, Mr. Moore decided to stop, turn, and continue arguing with the officials and flipped off the officials (Dkt. No. 19, ¶ 32).  Mr. Moore disputes Officer Gibson's observations (Dkt. No. 28, ¶ 32).

Prior to detaining Mr. Moore, Officer Gibson had been in the city park for nearly an hour, so what is initially viewed on the video is Officer Gibson heading toward the exit of the park (Dkt. No. 19, ¶ 33).  Officer Gibson then made contact with Mr. Moore, as well as Barbara McCrory,

who relayed that during the game, Mr. Moore became argumentative with parents and referees to the point that Mr. Moore was told by the referees and the soccer director to leave (*Id.*, ¶ 34). Officer Gibson got a witness statement from Ms. McCrory as well as Ref. Torling (*Id.*, ¶ 35).[6] Ms. McCrory reported to Officer Gibson as follows:

> Game began on soccer field #3 approx. 3:30 p.m.  We were approx. 6-8 minutes into the game when the ref made a call that Mr. Moore and visiting parents didn't agree with.  Referee halted the game and asked Mr. Moore and the other visiting coach to tell parents to stop "reffing" the game.  Mr. Moore escalated the discussion and began yelling that ref was biased and "well-known" for this.  Ref again told them to stop arguing and tell parents to be quiet other than cheering.  Mr. Moore continued to yell and was then told to leave the park.  As he left the field he continued to yell at ref and made a hand gesture of which I cannot be certain.  Coach remaining on sideline (not Mr. Moore) began arguing with ref so the game was ended by the ref.  We have banners indicating zero tolerance of any abuse to referees.  Abuse is not only physical, but refusal to follow directions given by referee and all clubs are made aware of such

(*Id.*, ¶ 36).

Ref. Torling reported to Officer Gibson as follows:

> While reffing a soccer game, approximately 6 minutes into the game, there was a disagreement about the call.  The visiting team's parents were complaining about the call.  I went over to that coach (Jeff Moore) and was trying to have him go talk to his parents have them calm down.  Before I could even do so, he already stepped onto the field and began to argue with me and called me "biased."  I finally was able to ask him to go talk to his parents.  He continued to argue, I again asked him to go talk to his parents and he continued to argue.  He was asked a 3rd or 4th time to go talk to his parents all while he continued to argue and yell at me.  He was then told to leave the park.  He slapped me in the stomach and said "ok."  He then hesitantly went to the parents' side and continued to argue and wouldn't leave.  I explained to him that he needed to get in his vehicle and leave before the game

---

[6] Mr. Moore objects to the inclusion of Ms. McCrory's statements in this Order, arguing that they are hearsay (Dkt. No. 28, ¶ 34, 36).  Pursuant to Federal Rule of Civil Procedure 56(c)(2), a party may object that material cited cannot be presented in a form that would be admissible in evidence.  The Court determines that this material can be presented at trial in a form that would be admissible in evidence and overrules the hearsay objection.  Further, the Court includes Ms. McCrory's statements because they go to the outcome determinative issue of whether Officer Gibson had probable cause.  Determining whether these statements are hearsay is not necessary, as "probable-cause determinations generally may be based on hearsay." *United States v. Leppert*, 408 F.3d 1039, 1042 (8th Cir. 2005).

continues.  I then asked the assistant coach to talk to the parents and he yelled across the field and he too yelled at me.  I explained to them both that if they didn't do as they were told, the game would be over.  Jeff Moore still refused to leave, and the assistant yelled even more.  I then called the end of the game.  I went to grab my belonging and went to a different field with my assistant referees.

(*Id.*, ¶ 37). [7]

Mr. Moore believed Barbara McCrory to be the Athletic Director of Vilonia (*Id.*, ¶ 38). Officer Gibson believed that the soccer game was cancelled due to Mr. Moore remaining on the property and being argumentative with officials and other parents (*Id.*, ¶ 39).[8]  Officer Gibson issued Mr. Moore a citation for disorderly conduct and criminal trespass (*Id.*, ¶ 40).  All parties but the parks and recreation officials left the area, and Officer Gibson resumed his patrol duties (*Id.*, ¶ 41).

The City park is a public park (*Id.*, ¶ 42).  The Parks and Recreation Director for the City, Johnny Alexander, is in charge of the City park (*Id.*, ¶ 43).  Officer Gibson spoke with Mr. Alexander about Mr. Moore's conduct before he issued Mr. Moore the citation (*Id.*, ¶ 44).  When ball games are going on, the referees and the person over the soccer program have all the authority (*Id.*, ¶ 45).

---

[7]  Mr. Moore objects to the inclusion of Ref. Torling's statements in this Order, arguing that they are immaterial and hearsay (Dkt. No. 28, ¶ 37).  Pursuant to Federal Rule of Civil Procedure 56(c)(2), a party may object that material cited cannot be presented in a form that would be admissible in evidence.  The Court determines that this material can be presented at trial in a form that would be admissible in evidence and overrules the hearsay objection.  Further, the Court includes Ref. Torling's statements because they go to the outcome determinative issue of whether Officer Gibson had probable cause.  Determining whether these statements are hearsay is not necessary, as "probable-cause determinations generally may be based on hearsay."  *Leppert*, 408 F.3d at 1042.

[8]  Mr. Moore denies that his actions were the reason the game ended (Dkt. No. 28, ¶ 39). The denial of this fact is not outcome determinative.

A bench trial occurred regarding Mr. Moore's criminal charges, at which Mr. Moore testified, taking the stand as the last witness, being questioned by his own attorney first, and then by the prosecutor (*Id.*, ¶ 46).  Mr. Moore was acquitted of the charges (*Id.*, ¶ 47).

Mr. Moore has no experience in law enforcement and has never received any formal training in law enforcement (*Id.*, ¶ 48).[9]  Officer Gibson takes continuous training (*Id.*, ¶ 49). Officer Gibson acted in compliance with his training (*Id.*, ¶ 50).  Officer Gibson acted in compliance with City policy (*Id.*, ¶ 51).  Officer Gibson has been in law enforcement on and off since 2004 and has been a full-time officer with the VPD since September 5, 2017 (*Id.*, ¶ 52). Officer Gibson has approximately 1231 hours of training (*Id.*, ¶ 53).  The VPD has official written policies that dictate that all stops, detentions, searches, seizures, arrests, and uses of force are constitutionally sound (*Id.*, ¶ 54).  The official written policy of the VPD regarding training is "to provide officers with continuous training on the recurring, high risk, critical tasks that an officer will face," including but not limited to search and seizure/arrest (with or without a warrant), and it directs "continuous training for the members of this department as well as the essential documentation of said training" (*Id.*, ¶ 55).

## II.    Legal Standard

### A.    Summary Judgment

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UnitedHealth Group Inc. v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Federal Rule of Civil Procedure 56

---

[9]  Mr. Moore objects to the inclusion of this statement, arguing that it is immaterial (Dkt. No. 28, ¶ 48).

and noting that summary judgment is proper if there is no genuine issue of material fact for trial).

Under such circumstances, the moving party is entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 322.  "In ruling on a motion for summary judgment '[t]he district court must base the determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'"  *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923 (8th Cir. 2004) (internal citations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Johnson Regional Medical Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997), *cert. denied*, 522 U.S. 1048 (1998).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### B.   Liability Under 42 U.S.C. § 1983 And The ACRA

Section 1983 provides a cause of action against any "person" who, acting "under color of" state law, deprives the plaintiff of "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983.  Municipalities and their employees are suable "persons" under § 1983, and the employees can be sued in both their official and individual capacities.  *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978); *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999).  A suit against a municipal employee in his or her official capacity is treated as a suit against the municipality for which the employee works.  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Hess v. Ables*, 714 F.3d 1048, 1054 (8th Cir. 2013).  A municipality is not liable under § 1983 unless there is an unconstitutional act by one of its employees and its official policy or custom caused the act.  *Monell*, 436 U.S. at 694; *Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018); *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) ("[T]o establish the liability of an official acting in his official capacity, the plaintiff must prove that 'a policy or custom [of the city] caused the alleged violation.'" (citation omitted)).

To the extent Mr. Moore brings claims pursuant to the ACRA, the ACRA prohibits persons, acting under color of state law, from depriving any person of any rights, privileges, or immunities secured by the Arkansas Constitution.  Ark. Code Ann. § 16-123-105; *see also West v. Atkins*, 487 U.S. 42 (1988).  The ACRA expressly requires that courts look to federal civil rights law for guidance.  *See Island v. Buena Vista Resort*, 103 S.W.3d 671, 675–76 (Ark. 2003).  As relevant, here, the Arkansas Supreme Court has stated that Article 2, § 15 of the Arkansas Constitution is "virtually identical to the Fourth Amendment" and will be interpreted "in the same manner as the United States Supreme Court interprets the Fourth Amendment."  *Rainey v. Hartness*, 5 S.W.3d

410, 415 (Ark. 1999).  The parties do not address the issue specifically of, and this Court understands that it is still an open question, whether the right to remonstrate protected by the ACRA provides the same amount, or more, protection to a person's speech than provided by the U.S. Constitution.  *See Graham v. Cawthorn,* 213 Ark. 160 (Ark. 2013).  This Court adopts the view that the right to remonstrate closely resembles a First Amendment retaliation claim and addresses these claims together.  *See Prunty v. City of Hot Springs*, Case No. 12-CV-6060, 2013 WL 4523220, at *2 (W.D. Ark. Aug. 27, 2013).

### C.    Qualified Immunity

Officer Gibson asserts in his answer that he is entitled to tort, qualified, statutory, good faith, and punitive damages immunity under all applicable doctrines of immunity pursuant to state and federal law, including but not limited to Ark. Code Ann. § 21-9-301 (Dkt. No. 5, at 7).  In his motion for summary judgment, Officer Gibson argues in favor of a grant of qualified immunity.

Officers sued under § 1983 in their individual capacities can raise qualified immunity as a defense.  This doctrine "shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known."  *Partlow v. Stadler*, 774 F.3d 497, 501 (8th Cir. 2014).  Courts use a two-step inquiry to determine whether qualified immunity applies:  "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."  *Id.* Plaintiffs must meet both steps to defeat qualified immunity, and courts can begin the analysis with either step.  *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015).

To determine whether qualified immunity is appropriate under the ACRA, courts apply the standard used for qualified immunity claims in federal civil rights actions.  *Sullivan v. Coney*, 427

S.W.3d 682, 685-86 (2013 Ark.) (internal citation and quotation omitted).  Under this analysis, a motion for summary judgment based on qualified immunity is precluded only when the plaintiff has:  (1) asserted a statutory or constitutional violation, (2) demonstrated that the statutory or constitutional right is clearly established, and (3) raised a genuine issue of fact as to whether the official would have known that the conduct violated that clearly established right.  *Id.*  Therefore, "[a]n official is immune from suit if his or her actions did not violate clearly established principles of law of which a reasonable person would have knowledge."  *Smith v. Brt*, 211 S.W.3d 485, 489 (Ark. 2005).  The objective reasonable-person standard is a legal inquiry, and whether summary judgment on grounds of qualified immunity is appropriate from a particular set of facts is a question of law.  *Id.*  "[T]he burden remains on the proponent of the immunity to establish the relevant predicate facts, and at the summary-judgment stage the nonmoving party is given the benefit of all reasonable inferences."  *Baldridge v. Cordes*, 85 S.W.3d 511, 515 (Ark. 2002).

Given the Court's rulings on Mr. Moore's federal claims, the Court declines to reach the merits of Mr. Moore's additional state law claims and therefore declines to address Officer Gibson's additional claims of statutory immunity under Arkansas law.

**III.   Claims Against Officer Gibson In His Individual Capacity**

**A.   Fourth Amendment Claim**

**1.   Applicable Law**

"In a series of recent decisions, the Supreme Court has emphasized that for a plaintiff to overcome qualified immunity, existing precedent must have placed the constitutional question 'beyond debate.'"  *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 989 (8th Cir. 2015) (quoting *City & Cnty. of S.F., Calif. v. Sheehan*, 575 U.S. 600, 611 (2015)).  The Supreme Court has assumed, without deciding, that "a controlling circuit precedent could constitute clearly

established federal law." *Sheehan*, 575 U.S. at 614 (quoting *Carroll v. Carman*, 574 U.S. 13 (2014) (per curiam)).  These events occurred on March 24, 2018 (Dkt. No. 28, ¶ 1).

### a.       Terry Stop

"Officers may conduct an investigatory *Terry* stop when, based on the totality of the circumstances, they have 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'"  *Parker v. Chard*, 777 F.3d 977, 980 (8th Cir. 2015) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).  "Reasonable suspicion is a lower threshold than probable cause, and it requires considerably less than proof of wrongdoing by a preponderance of the evidence.'"  *Williams v. Decker*, 767 F.3d 734, 739 (8th Cir. 2014), *cert. denied*, 574 U.S. 1165 (2015) (quoting *United States v. Carpenter*, 462 F.3d 981, 986 (8th Cir. 2006) (internal citation omitted)).  "Reasonable suspicion of criminal activity can be based upon a mistake of fact so long as that mistake was objectively reasonable."  *Williams*, 767 F.3d at 740 (citing *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2004)); *see also McKenney v. Harrison*, 635 F.3d 354, 358-59 (8th Cir. 2011) (explaining that an officer does not lose his entitlement to qualified immunity by acting upon an objectively reasonable mistake of fact)).  The right to make a *Terry* stop based on reasonable suspicion was clearly established at the time of Mr. Moore's stop.

### b.       Arrest

"[A] Terry stop that becomes an arrest must be supported by probable cause."  *Williams*, 767 F.3d at 742 (quoting *United States v. Aquino*, 674 F.3d 918, 924 (8th Cir. 2012)).  The Eighth Circuit has consistently held that a warrantless arrest without probable cause violates clearly established law.  *Thurairajah v. City of Fort Smith, Arkansas*, 925 F.3d 979, 984 (8th Cir. 2019).  That right was clearly established at the time of Mr. Moore's arrest.

"A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'" *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011) (quoting *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)). "Probable cause exists when the totality of circumstances demonstrates that a prudent person would believe that the arrestee has committed or was committing a crime." *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999). Probable cause is a "fluid concept." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "The arresting officer himself need not possess all of the available information"; probable cause is assessed by the collective knowledge of the relevant officers and available objective facts. *United States v. Stratton*, 453 F.2d 36, 37 (8th Cir.), *cert. denied*, 405 U.S. 1069 (1972).

The Eighth Circuit Court of Appeals has not decided "whether the Fourth Amendment permits a warrantless arrest for a misdemeanor when the alleged offense did not occur in the presence of the arresting officer." *Gilmore v. City of Minneapolis*, 837 F.3d 827, 834 (8th Cir. 2016) (quoting *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1258 (8th Cir. 2010)). "A constitutional or statutory right is clearly established if '[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1155 (8th Cir. 2014) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The law regarding whether warrantless misdemeanor arrests for offenses committed outside the presence of the arresting officer comport with the Fourth Amendment was not clearly established at the time of Mr. Moore's arrest.

However, the Eighth Circuit has determined in a series of cases that a party can demonstrate "arguable probable cause" based on "some observation—either by officers personally or by an eyewitness or victim whose account is communicated to officers—of the *actus reus* of a potential crime." *Johnson v. City of Minneapolis*, 901 F.3d 963, 969 (8th Cir. 2018) (examining cases). Arguable probable cause exists if the arrest "was based on an objectively reasonable—even if mistaken—belief that the arrest was based in *probable cause*." *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1059 (8th Cir. 2013). Arguable probable cause provides law enforcement officers in a qualified immunity analysis "an even wider berth for mistaken judgments" than the probable cause standard affords a reasonable person. *Id*. Analyzing whether arguable probable cause exists "necessarily includes consideration of probable cause." *Id*; *see also Thurairajah*, 925 F.3d at 983.

When deciding whether to arrest a subject, "[o]fficers may 'rely on the veracity of information supplied by the victim of a crime.'" *Borgman*, 646 F.3d at 523 (quoting *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 817 (8th Cir. 2010); *see also Gilmore*, 837 F.3d at 832-33; *Kuehl v. Burtis*, 173 F.3d at 650 ("[A]n officer may make an arrest if a credible eyewitness claims to have seen the suspect commit the crime. . . ."). "In considering information given by a victim of a crime, an officer need not conduct a 'mini-trial' before effectuating an arrest although he cannot avoid 'minimal further investigation' if it would have exonerated the suspect." *Borgman*, 646 F.3d at 523 (quoting *Kuehl*, 173 F.3d at 650).

"An officer contemplating an arrest is not free to disregard plainly exculpatory evidence. . . ." *Kuehl*, 173 F.3d at 650. Even if there were conflicting versions of events that occurred, that fact, on its own, does not establish there was plainly exculpatory evidence available to the officers at or near the time of the arrest. "When an officer is faced with conflicting information that cannot

be immediately resolved. . . he may have arguable probable cause to arrest a suspect." *Borgman*, 646 F.3d at 523; *see also Gilmore*, 837 F.3d at 833.

Where a person is arrested for several charges, the arrest is lawful if probable cause existed for only one of the charges. *Linn v. Garcia*, 531 F.2d 855, 862 (8th Cir. 1976). "[A]n officer need only demonstrate probable cause to carry out an arrest for any offense arising out of an incident. That the officer may have had a mistaken belief that he had probable cause to arrest for other offenses is immaterial so long as probable cause existed for the one offense." *Smithson v. Aldrich*, 235 F.3d 1058, 1062 (8th Cir. 2000). Further, whether the person arrested is found not guilty is not material. *Arnott v. Mataya*, 995 F.2d 121, 124 (8th Cir. 1993).

An arresting officer's state of mind except for the facts that he knows is irrelevant to the existence of probable cause. *See Whren v. United States,* 517 U.S. 806, 812–813 (1996) (reviewing cases); *Arkansas v. Sullivan,* 532 U.S. 769 (2001) *(per curiam).* In other words, an officer's subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause. "[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent." *Whren,* 517 U.S. at 814; *see also Devenpeck*, 543 U.S. at 153.

Probable cause is determined at the moment the arrest was made, and any later developed facts are irrelevant to the probable cause analysis for an arrest. *Gilmore*, 837 F.3d at 833. Whether probable cause or arguable probable cause existed at the time of the arrest is a question of law for the court. *Fisher*, 619 F.3d at 816.

### c.    Substantive Offenses

Here, Officer Gibson focuses on three potential offenses as giving rise to reasonable suspicion, arguable probable cause, and probable cause. The Court examines each offense.

### i.       Disorderly Conduct

The Arkansas disorderly conduct statute at issue here provides:

(a) A person commits the offense of disorderly conduct if, with the purpose to cause public inconvenience, annoyance, or alarm or recklessly creating a risk of public inconvenience, annoyance, or alarm, he or she:

> (1) Engages in fighting or in violent, threatening, or tumultuous behavior;
>
> (2) Makes unreasonable or excessive noise;
>
> (3) In a public place, uses abusive or obscene language, or makes an obscene gesture, in a manner likely to provoke a violent or disorderly response;
>
> (4) Disrupts or disturbs any lawful assembly or meeting of persons;
>
> (5) Obstructs vehicular or pedestrian traffic;
>
> (6) Congregates with two (2) or more other persons in a public place and refuses to comply with a lawful order to disperse of a law enforcement officer or other person engaged in enforcing or executing the law;
>
> (7) Creates a hazardous or physically offensive condition;
>
> (8) In a public place, mars, defiles, desecrates, or otherwise damages a patriotic or religious symbol that is an object of respect by the public or a substantial segment of the public; or
>
> (9) In a public place, exposes his or her private parts.

(b) Disorderly conduct is a Class C misdemeanor.

Ark. Code Ann. § 5-71-207.   Section 5-71-207(a)(1) "does not require an actual public inconvenience, annoyance or alarm.   The statute requires only that a person engage in fighting or in violent, threatening, or tumultuous behavior with the purpose of creating a public inconvenience, annoyance or alarm *or* that a person engages in such behavior in a way that recklessly creates a risk of public inconvenience, annoyance or alarm." *M.T. v. State*, 350 S.W.3d 792, 795 (Ark. Ct. App. 2009); *see Duhe v. City of Little Rock*, 902 F.3d 858, 864 (8th Cir. 2018) (noting that a person violates § 5-71-207(a)(2) by obstructing traffic or making unreasonable or

excessive noise while intending to cause public inconvenience, annoyance, or alarm or recklessly disregarding the risk of doing so).  Further, under Arkansas law, "[a] person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result."  Ark. Code Ann. § 5-2-202(1).  "A person acts recklessly with respect to attendant circumstances or a result of his or her conduct when the person consciously disregards a substantial and unjustifiable risk that the attendant circumstances exist or the result will occur. . . .  The risk must be of a nature and degree that disregard of the risk constitutes a gross deviation from the standard of care that a reasonable person would observe in the actor's situation."  Ark. Code Ann. § 5-2-202(3).

Courts interpreting the Arkansas disorderly conduct statute have generally determined that evidence supports a probable cause determination or conviction for disorderly conduct where a person acts erratically or loudly under the circumstances or intends to disrupt a gathering.  *See Duhe*, 902 F.3d at 863 (affirming this Court's determination that officer had at least arguable probable cause to arrest plaintiffs for violating disorderly conduct statute where officer observed plaintiffs obstructing traffic and making loud noises with a microphone and amplifier); *Johnson v. Gilbert*, No. 4:18-cv-824-DPM, 2020 WL 3037069, at *2 (E.D. Ark. June 5, 2020) (concluding that officer had arguable probable cause to arrest plaintiff who did not comply with officers' lawful orders to disperse); *Johnson v. State*, 37 S.W.3d 191, 195 (Ark. 2001) (affirming conviction where defendant engaged in "erratic behavior, curs[ed], flail[ed] his arms," and exhibited violent demeanor towards officer); *E.S. v. State*, No. CV-13-99, 2013 WL 2445213, at *2 (Ark. Ct. App. June 5, 2013) (affirming conviction where juvenile encouraged friends to fight); *Watkins v. State*, 377 S.W.3d 286, 291 (Ark. Ct. App. 2010) (affirming conviction where defendant intimidated and cursed at officers and others and acted irrationally and aggressively); *Pride v. State*, No. CACR

99-272, 1999 WL 826184, at *2 (Ark. Ct. App. Oct. 13, 1999) (affirming conviction where defendant was "yelling, screaming, using profanity, and acting in an irate, hostile, and irrational manner, and continued to do so after being placed in the police car").

On the other hand, courts interpreting the Arkansas disorderly conduct statute have held that officers did not have probable cause where a person was making fleeting comments or acting non-threateningly and where caselaw did not support a probable cause determination. *Thurairajah*, 925 F.3d at 983 (observing that "[i]n no case[] has a two-word unamplified outburst constituted disorderly conduct" and affirming denial of qualified immunity for officer who arrested plaintiff without probable cause); *Rochell v. Ross*, Case No. 5:16-cv-5093, 2021 WL 737137, at *6 (W.D. Ark. Feb. 25, 2021) (observing in *dicta* that no crime was committed, but noting that plaintiff's state-court conviction foreclosed review, where plaintiff stood in his front yard with an AR-15 rifle strapped to his back and pointing toward the ground, made no threatening gestures, did not touch the weapon, complied with police orders, and never made any aggressive movements).

### ii.      Trespass

Arkansas law provides that "[a] person commits criminal trespass if he or she purposely enters or remains unlawfully in or upon. . . the premises owned or leased by another person." Ark. Code Ann. § 5-39-203.

Mr. Moore claims that the soccer complex was open to the public and cites this Court to Arkansas Model Jury Instruction -- Criminal ("AMI") 3904 for what he contends is the controlling law in this situation (Dkt. No. 29, at 6). That instruction states: "A person who. . . remains in or upon premises that are, at the time, open to the public does so with license and privilege, regardless of his purpose, unless he defies a lawful order not to. . . remain, personally communicated to him

by the owner of such premises or some other person authorized by the owner." AMI 3904 (*Definitions*). Purposely means that a person has a "conscious object to engage in the conduct." *Id.*

### iii.     Abuse Of Athletic Official

Pursuant to Arkansas law, a "person commits abuse of an athletic official if, with the purpose of causing physical injury to another person, the person strikes or otherwise physically abuses an athletic contest official immediately prior to, during, or immediately following an interscholastic, intercollegiate, or any other organized amateur or professional athletic contest in which the athletic contest official is participating." Ark. Code Ann. § 5-13-209.

### 2.     Analysis

#### a.     Initial Stop

Based on the undisputed record evidence with all reasonable inferences construed in favor of Mr. Moore, the Court concludes that Officer Gibson at the outset had reasonable suspicion to stop Mr. Moore for the suspected offenses of disorderly conduct and criminal trespass.

It is undisputed that, at that time, Officer Gibson had been flagged down by parents attending the game who then told Officer Moore that there was an individual that had been causing a disturbance, had used obscene language, and was refusing to leave city property after being instructed to do so by parks and recreation staff; the parents pointed Mr. Moore out to Officer Gibson as that individual (Dkt. No. 28, ¶¶ 25-26).

Further, it is undisputed that, after a heated verbal exchange between Ref. Torling and Mr. Moore regarding a call, Mr. Moore was told to leave the soccer complex by those with authority to do so (*Id.*, ¶¶ 6-14, 18-22, 38, 42-45). It is also undisputed that Mr. Moore took the time to walk over to where his teams' parents were located, retrieve his cooler of Gatorade and his tablet, change

his mind in that regard, grab a Gatorade from the cooler, and converse with the parents on his team and answer their questions (*Id.*, ¶¶ 15-21).  When Mr. Moore turned to start walking to his car, after Ref. Torling yelled at him a third time that he had to leave, Mr. Moore made a gesture to Ref. Torling (*Id.*, ¶¶ 15-23).

### b.        Request To Wait By And Outside Of Cruiser

Based on the undisputed record evidence with all reasonable inferences construed in favor of Mr. Moore, the Court concludes that, at a minimum, Officer Gibson had arguable probable cause to arrest for the offenses of disorderly conduct and criminal trespass at the time Officer Gibson asked Mr. Moore to wait by and outside of Officer Gibson's police cruiser.

It is undisputed that, at that time, Officer Gibson had been flagged down by parents attending the game who then told Officer Moore that there was an individual that had been causing a disturbance, had used obscene language, and was refusing to leave city property after being instructed to do so by parks and recreation staff, and that the parents pointed Mr. Moore out as that individual (Dkt. No. 28, ¶¶ 25-26).

Officer Gibson contends that he observed Mr. Moore walking in the area of the parents, children, and young soccer players who were at the game and make what he believed to be an obscene gesture toward other people at the soccer game (*Id.*, ¶ 27).  While Mr. Moore admits that he made a gesture to Ref. Torling, he claims that it was a thumbs up (*Id.*).  He also claims that, when he did that, he had passed the parents and children and had gone into the road (*Id.*).  Mr. Moore further claims that Officer Gibson was 50 yards away at that point (*Id.*).

In contrast, Officer Gibson believes that he saw Mr. Moore make an obscene gesture in the presence of children, specifically claiming that Mr. Moore "flipp[ed] off" Ref. Torling (*Id.*).  There is dashcam video of this incident provided by the parties that this Court has reviewed.  From the

dashcam video, it is clear that, at the time he approached Mr. Moore and asked him to wait by his cruiser, Officer Gibson believed Mr. Moore had made an obscene gesture in the area of the parents, children, and young soccer players who were at the game.  This Court agrees that, given the information relayed to Officer Gibson by parents, and his distance from Mr. Moore, it is not unreasonable that Officer Gibson believed Mr. Moore to be "flipping the bird."

At that point, Officer Gibson asked Mr. Moore to wait by and outside of Officer Gibson's police cruiser while Officer Gibson spoke to witnesses.

### c.    Writing The Citation

Based on the undisputed record evidence with all reasonable inferences construed in favor of Mr. Moore, the Court concludes that, at a minimum, Officer Gibson had arguable probable cause to arrest Mr. Moore for the offenses of disorderly conduct, criminal trespass, and abuse of an athletic official after obtaining the statements of Ms. McCrory and Ref. Torling and after speaking to  Parks and Recreation Director for the City, Johnny Alexander, and prior to writing Mr. Moore the citation.

Although Mr. Moore disputes that this is what occurred, Mr. Moore does not dispute that Ms. McCrory reported to Officer Gibson the following:

> Game began on soccer field #3 approx. 3:30 p.m.  We were approx. 6-8 minutes into the game when the ref made a call that Mr. Moore and visiting parents didn't agree with.  Referee halted the game and asked Mr. Moore and the other visiting coach to tell parents to stop "reffing" the game.  Mr. Moore escalated the discussion and began yelling that ref was biased and "well-known" for this.  Ref again told them to stop arguing and tell parents to be quiet other than cheering.  Mr. Moore continued to yell and was then told to leave the park.  As he left the field he continued to yell at ref and made a hand gesture of which I cannot be certain.  Coach remaining on sideline (not Mr. Moore) began arguing with ref so the game was ended by the ref.  We have banners indicating zero tolerance of any abuse to referees.  Abuse is not only physical, but refusal to follow directions given by referee and all clubs are made aware of such.

(Dkt. No. 28, ¶ 36).  Mr. Moore believed Barbara McCrory to be the Athletic Director of Vilonia (*Id.*, ¶ 38).

Further, although Mr. Moore disputes that this is what occurred, Mr. Moore does not dispute that Ref. Torling reported to Officer Gibson the following:

> While reffing a soccer game, approximately 6 minutes into the game, there was a disagreement about the call.  The visiting team's parents were complaining about the call.  I went over to that coach (Jeff Moore) and was trying to have him go talk to his parents have them calm down.  Before I could even do so, he already stepped onto the field and began to argue with me and called me "biased."  I finally was able to ask him to go talk to his parents.  He continued to argue, I again asked him to go talk to his parents and he continued to argue.  He was asked a 3rd or 4th time to go talk to his parents all while he continued to argue and yell at me.  He was then told to leave the park.  He slapped me in the stomach and said "ok."  He then hesitantly went to the parents' side and continued to argue and wouldn't leave.  I explained to him that he needed to get in his vehicle and leave before the game continues.  I then asked the assistant coach to talk to the parents and he yelled across the field and he too yelled at me.  I explained to them both that if they didn't do as they were told, the game would be over.  Jeff Moore still refused to leave, and the assistant yelled even more.  I then called the end of the game.  I went to grab my belonging and went to a different field with my assistant referees.

(*Id.*, ¶ 37).

The parties do not dispute that the City park is a public park (*Id.*, ¶ 42).  The parties agree that the Parks and Recreation Director for the City, Johnny Alexander, is in charge of the City park (*Id.*, ¶ 43).  It is undisputed that Officer Gibson spoke with Mr. Alexander about Mr. Moore's conduct before he issued Mr. Moore the citation (*Id.*, ¶ 44).  Further, it is undisputed that, when ball games are going on, the referees and the person over the soccer program have all the authority (*Id.*, ¶ 45).

The parties do not dispute that Officer Gibson issued Mr. Moore a citation for disorderly conduct and criminal trespass (*Id.*, ¶ 40).  From the dashcam video, it is clear that at no time during this encounter was Mr. Moore handcuffed, put into Officer Gibson's police cruiser, or transported anywhere.

Based on the undisputed record evidence with all reasonable inferences construed in favor of Mr. Moore, the Court concludes that Officer Gibson is entitled to qualified immunity and summary judgment in his favor on Mr. Moore's Fourth Amendment claims.

### B.   First Amendment Claim

Mr. Moore also brings a First Amendment retaliation claim against Officer Gibson.  To establish a claim arising from their arrest for First Amendment retaliation under § 1983:

> "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006).  To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must show (1) "he engaged in a protected activity;" (2) "the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity;" (3) "the adverse action was motivated at least in part by the exercise of the protected activity;" and (4) "lack of probable cause or arguable probable cause." *Hoyland v. McMenomy*, 869 F.3d 644, 655 (8th Cir. 2017) (quoting *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014)). Under the third prong, "[r]etaliation need not have been the sole motive, but it must have been a 'substantial factor' in the decision to arrest."  *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010) (quoting *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007)).   "Furthermore, the plaintiffs must show that the retaliatory motive was a 'but-for' cause of the arrest—i.e., that the plaintiffs were 'singled out' because of their exercise of constitutional rights." *Id.*

*Burbridge v. City of St. Louis, Missouri*, 430 F. Supp. 3d 595, 611 (E.D. Mo. 2019), *aff'd*, 2 F.4th 774 (8th Cir. 2021); *see also Carroll v. Pfeffer,* 262 F.3d 847, 850 (8th Cir. 2001) (quoting *Bloch v. Ribar,* 156 F.3d 673, 678 (6th Cir. 1998)).

With respect to the "causal connection" required, the Supreme Court explained:

> To prevail on such a claim, a plaintiff must establish a "causal connection" between the government defendant's "retaliatory animus" and the plaintiff's "subsequent injury."  . . .  It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury.  Specifically, it must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.

*Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).

The causation standard for a plaintiff to establish a claim of selective prosecution requires the plaintiff to prove "that he has been singled out for prosecution while others similarly situated have not been prosecuted for conduct similar to that for which he was prosecuted [and] that the government's discriminatory selection of him for prosecution was based upon . . . his exercise of his first amendment right to free speech." *United States v. Catlett,* 584 F.2d 864, 866 (8th Cir. 1978) (citing *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir. 1974)); *see also Osborne v. Grussing*, 477 F.3d 1002, 1006 (8th Cir. 2007) (citing with approval this standard and applying it to a plaintiff's claim seeking relief from valid adverse regulatory action on the ground that it was unconstitutional retaliation for First Amendment protected speech).

Mr. Moore argues that Officer Gibson stopped and arrested him because Officer Gibson believed that Mr. Moore made an obscene gesture to Ref. Torling that Mr. Moore claims was protected speech.  Assuming without deciding that Mr. Moore's obscene gesture to Ref. Torling was protected speech, given the undisputed facts even with all reasonable inferences construed in Mr. Moore's favor, this Court determines that no reasonable factfinder could conclude that Mr. Moore's obscene gesture was the "but-for" cause of Mr. Moore's being stopped and arrested by Officer Gibson.  Further, to maintain such a claim Mr. Moore must prove that Officer Gibson lacked probable cause or arguable probable cause, which this Court has determined Mr. Moore cannot do.  Based on the undisputed record evidence with all reasonable inferences construed in favor of Mr. Moore, the Court concludes that no reasonable factfinder could find in favor of Mr. Moore on his First Amendment retaliation claim.  Officer Gibson is entitled to summary judgment in his favor on this claim.

IV.     **Claims Against Officer Gibson In His Official Capacity**

Mr. Moore asserts that Officer Gibson's allegedly unconstitutional actions were a result of a failure to train Officer Gibson and brings a claim against Officer Gibson in his official capacity for alleged failure to train.  Mr. Moore's failure to train claim against Officer Gibson in his official capacity fails.  First, "respondeat superior is inapplicable to claims under 42 U.S.C. § 1983." *Bell v. Kan. City Police Dep't,* 635 F.3d 346, 347 (8th Cir.2011) (per curiam).  Second, this Court determines that Officer Gibson is entitled to qualified immunity and did not violate Mr. Moore's constitutional rights; therefore, Mr. Moore's "failure to train and failure to supervise claims. . . [can]not be sustained absent an underlying constitutional violation by the officer." *Sitzes v. City of W. Memphis Ark.,* 606 F.3d 461, 470–71 (8th Cir.2010) (citing *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) (per curiam); *Monell,* 436 U.S. at 691 ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."); *Royster v. Nichols*, 698 F.3d 681, 692–93 (8th Cir. 2012); *Sanders v. City of Minneapolis, Minn.,* 474 F.3d 523, 527 (8th Cir.2007) ("Without a constitutional violation by the individual officers, there can be no § 1983 or *Monell* failure to train municipal liability.")).

To the extent Mr. Moore purports to assert against Officer Gibson in his official capacity a claim that the constitutional violations stemmed from an official policy or custom, *Monell* holds a municipality liable for actions of its employees or agents that violate a plaintiff's constitutional rights if the violation stemmed from an official municipal policy or custom.  436 U.S.at 694-95; *Ulrich*, 715 F.3d at 1061.  "There must be a causal connection between the municipal policy or custom and the alleged constitutional violation in order to state a valid claim under § 1983." *Ulrich*, 715 F.3d at 1061 (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)); *see also*

*Waters v. Madson*, 921 F.3d 725, 743 (8th Cir. 2019).  Because Mr. Moore fails to establish a constitutional violation by Officer Gibson, there can be no § 1983 or *Monell* policy or custom claim.

For these reasons, Officer Gibson is entitled to summary judgment in his favor on Mr. Moore's official capacity claims.

### V.      State Law Claims

Mr. Moore asserts other state law claims of malicious prosecution and abuse of process (Dkt. No. 1, ¶ 28).  Because the Court grants summary judgment in favor of Officer Gibson on Mr. Moore's federal claims, the Court declines to exercise supplemental jurisdiction over any of Mr. Moore's remaining state law claims.

## VI.    Conclusion

The Court concludes that, based on the record before it, there was reasonable suspicion and, at a minimum, arguable probable cause to support Officer Gibson's stopping and arresting of Mr. Moore for at least one of the crimes discussed in this Order.  For these reasons, the Court concludes that Mr. Moore has failed to establish that Officer Gibson violated Mr. Moore's First and Fourth Amendment rights, and the Court determines that Officer Gibson is entitled to qualified immunity on Mr. Moore's federal constitutional claims brought against him in his individual capacity under § 1983 and state constitutional claims brought against him in his individual capacity under the ACRA to extent those rights under Arkansas law equate to those rights under federal law.  The Court declines to exercise supplemental jurisdiction over any of Mr. Moore's remaining state law claims and dismisses those claims without prejudice.

It is so ordered this 31st day of March, 2022.

Kristine G. Baker
United States District Judge